**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **STATE OF ALASKA**<br><br>**Plaintiff,**<br><br>vs.<br><br>**DIRK KEMPTHORNE, et al.,**<br><br>**Defendants,**<br><br>**and**<br><br>**CENTER FOR BIOLOGICAL DIVERSITY,**<br>**1333 N. Oracle Rd.**<br>**Tucson, AZ 85705**<br><br>**NATURAL RESOURCES DEFENSE COUNCIL,**<br>**40 West 20th Street**<br>**New York, NY 10011**<br><br>**GREENPEACE, Inc.,**<br>**75 Arkansas St.**<br>**San Francisco, CA 94107**<br><br>**Intervenor-Defendant –Applicants.** | **Civil Action No. 1:08-cv-01352 EGS** |

**INTERVENOR-CONSERVATION GROUPS' MOTION TO INTERVENE
AS DEFENDANTS AND MEMORANDUM IN SUPPORT**

Pursuant to Federal Rule of Civil Procedure 24 and Local Civil Rule 7(j), the

Center for Biological Diversity ("Center"), Natural Resources Defense Council

("NRDC") and Greenpeace, Inc. ("Greenpeace") (collectively, "Conservation Groups")

hereby move this Court to intervene as of right as Defendants in this case, or, in the

alternative, for permissive intervention. Counsel consulted with counsel for Defendants

and Plaintiffs and determined that Defendants take no position on Conservation Groups'

motion and counsel for Plaintiffs indicated that they will take no position on

Conservation Groups' motion pending review of this motion and memorandum.

**BACKGROUND**

In this case, Plaintiff State of Alaska ("Alaska") challenges the final rule classifying polar bears as a threatened species under the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531, et seq. *See* Endangered and Threatened Wildlife and Plants, Determination of Threatened Status for the Polar Bear (*Ursus maritimus*) Throughout its Range, 73 Fed. Reg. 28,212, 28,214 (May 15, 2008) ("Final Listing Rule").[1]

The road to protection for the polar bear under the ESA has been a long one.  The Conservation Groups seeking intervention in this case set the polar bear on that road through the filing of a February 2005 petition with the Secretary of Interior and the U.S. Fish and Wildlife Service (collectively, "the Secretary") to list the polar bear under the ESA.  Due to the Secretary's delay in responding to the petition, the Conservation Groups were forced to file two lawsuits to compel his compliance with the mandatory deadlines for action established by the ESA's listing process.  The second of these two cases, Center for Biological Diversity v. Kempthorne, 2008 WL 1902703 (N.D. Cal. Apr. 28, 2008) (No. 08-1339) ("Center for Biological Diversity II"), resulted in the court order requiring the Secretary to issue the final listing rule for the polar bear challenged here.  The Center for Biological Diversity II case is still ongoing in the Northern District of California, as the Conservation Groups have challenged the Secretary's failure to designate the polar bear as an endangered species and to designate critical habitat for the

---

[1] The Background Section of this brief may be familiar to the court as many of these facts were described in Conservation Groups' motion to intervene in a related case, Safari Club International v. Kempthorne, No. 08-881, (D.D.C. May 23, 2008) (Dkt. # 11).  The Court granted Conservation Groups motion to intervene on June 10, 2008.

polar bear, as well as other aspects of the final listing rule and special rule issued by the Secretary, both of which unlawfully reduce protection to the species.

Because Alaska's lawsuit directly threatens Conservation Groups' and its members' interest in protecting polar bears, and threatens to undue years of successful administrative and legal advocacy, Conservation Groups now move to intervene as of right in this matter or in the alternative for permissive intervention. As detailed below, Conservation Groups easily meet the four-part test for intervention as of right in this action and should be granted intervention in order to protect their interests in the survival and recovery of the polar bear and its habitat.

**A.    Events Leading to the Listing of the Polar Bear**

In 2005, Conservation Groups petitioned the Secretary to list the polar bear as a threatened or endangered species throughout its range. *See* Endangered and Threatened Wildlife and Plants; 12-Month Petition Finding and Proposed Rule To List the Polar Bear (*Ursus maritimus*) as Threatened Throughout Its Range Proposed Rule and Notice of 12-month Finding, 72 Fed. Reg. 1064 (Jan. 9, 2007). The polar bear, a marine mammal completely dependent on the Arctic sea ice for survival, is poised to become one of the first species to fall victim to global warming. Arctic sea ice is the polar bear's primary habitat, the platform from which they hunt and on which they breed. Endangered and Threatened Wildlife and Plants, Determination of Threatened Status for the Polar Bear (*Ursus maritimus*) Throughout its Range, 73 Fed. Reg. 28,212, 28,214 (May 15, 2008) ("Final Listing Rule"). The polar bear's Arctic sea-ice habitat is quite literally melting away. As noted in the Final Listing Rule, even under relatively optimistic scenarios, scientists expect that the Arctic's summer sea ice will largely vanish by mid-century;

under increasingly likely scenarios, the seasonal ice upon which the polar bear depends

will be gone in less than a decade.  73 Fed. Reg. 28,233.  Without sea ice, polar bears

cannot survive.  73 Fed. Reg. 28,262.   In addition, polar bear populations are also

threatened by oil and gas exploration and development, poaching in Russia, overhunting

in Canada and Greenland, and widespread toxic contamination.  See, e.g., 73 Fed. Reg.

28,256 (recognizing the variety of threats facing polar bears today and acknowledging

that the cumulative effects of these "multiple stressors" and the "rapid rate of climate

change today create a unique and unprecedented challenge for present-day polar bears").

Under the ESA, the Secretary of the Interior has 90 days "to the maximum extent

practicable," to make a finding as to whether a petition to list a species "presents

substantial scientific or commercial information indicating that the petitioned action may

be warranted."  16 U.S.C § 1533(b)(3)(A); 50 C.F.R. § 424.14(b)(1).  If the Secretary

answers this question in the affirmative, he then has 12 months from the date the petition

was filed to decide whether to grant the petition and, if so, issue a proposed rule listing

the species.  16 U.S.C. § 1533(b).

In the case of the polar bear, however, the Secretary did not make any findings in

responding to Conservation Groups' petition to list the bear ten months after it had been

filed.  Accordingly, on December 15, 2005, Conservation Groups filed suit to compel

action.  Complaint for Declaratory and Injunctive Relief, Center for Biological Diversity

v. Kempthorne, No. 05-5191 (N.D. Cal. dismissed due to Consent Decree dated Jan. 11,

2007) ("Center for Biological Diversity I"); 72 Fed. Reg. 1065.

In response to Conservation Groups' suit, on February 9, 2006, the Secretary

issued a 90-day finding on the Petition to list the polar bear.  Endangered and Threatened

4

Wildlife and Plants; Petition To List the Polar Bear as Threatened Notice of 90-day

Petition Finding and Initiation of Status Review, 71 Fed. Reg. 6745 (Feb. 9, 2006). The

Secretary found that the Petition presented substantial information showing that listing of

the polar bear may be warranted under the ESA, initiated a status review for the species,

and solicited public comment for a period of 60 days. Id.

Because the Secretary delayed the 90-day finding until nearly one year had passed

from receipt of the Petition, the Secretary also failed to meet the deadline for issuance of

the 12-month finding. As a result, a consent decree was entered in Center for Biological

Diversity I that required the Secretary to issue the required 12-month finding by

December 27, 2006.

On December 27, 2006, the Secretary announced a proposed rule to list the polar

bear as a threatened species throughout its range. The proposed rule was published in the

Federal Register on January 9, 2007. 72 Fed. Reg. 1064. After a species is formally

proposed for addition to the list of threatened and endangered species, the ESA requires,

except in narrow circumstances not present here, that the Secretary make a final decision

on the proposed listing within a year. 16 U.S.C. § 1533(b)(6). Thus, under the ESA, the

Secretary was required to publish his final listing determination and critical habitat

designation by January 9, 2008. The Secretary, however, missed this deadline as well.

As a result, Conservation Groups again filed suit on March 10, 2008 to compel the

issuance of a final rule. Complaint for Declaratory and Injunctive Relief, Center for

Biological Diversity II (No. 08-1339, Dkt. # 1). Conservation Groups moved for

summary judgment on April 2, 2008, and requested that the Court order a final

determination to be made no later than May 15, 2008 and, if that determination was positive, that the listing of the polar bear become immediately effective.

On April 28, 2008, the District Court for the Northern District of California granted Conservation Groups' Motion for Summary Judgment, finding the Secretary and the Service in violation of the ESA for failing to publish a final listing decision for the polar bear by January 9, 2008. Center for Biological Diversity II, WL 1902703, at *2. The Court ordered the Secretary and the Service to publish a final listing determination for the polar bear by May 15, 2008, and to make any final regulation effective upon publication pursuant to 5 U.S.C. § 553(d)(3). Center for Biological Diversity II, 2008 WL 1902703, at *3-*4.

### B.    The Final Listing Rule Challenged in this Action

On May 15, 2008, the Secretary published the Final Rule, listing the polar bear as a threatened species throughout its range due to the rapid warming of the Arctic and melting of the bear's sea-ice habitat. In the Final Listing Rule, the Secretary found that, due to global warming, two-thirds of the world's bears are likely to be extinct by the middle of this century and cautioned that even this projection may be overly optimistic due to the more rapid than predicted melting of the sea ice. 73 Fed. Reg. 28,274. The Secretary further concluded "polar bears today contend with harvest, contaminants, oil and gas development, and additional interactions with humans that they did not experience in [the past]….Thus, both the cumulative effects of multiple stressors and the rapid rate of climate change today create a unique and unprecedented challenge for present-day polar bears…." 73 Fed. Reg. 28256.

Concurrently with the final listing rule, the Secretary issued a regulation pursuant to Section 4(d) of the ESA, which authorizes activities that harm polar bears and would otherwise be prohibited by Section 9 of the ESA and its implementing regulations. Endangered and Threatened Wildlife and Plants, Special Rule for the Polar Bear, 73 Fed. Reg. 28,306 (May 15, 2008) ("4(d) Rule"); 40 C.F.R. § 17.40(q).

**C.    Current Ongoing Litigation Concerning the Polar Bear Listing Rule and 4(d) Regulation**

Immediately following the listing decision, the Conservation Groups filed an amended Complaint in the Northern District of California, adding challenges to the legal validity of the 4(d) Rule under the Administrative Procedures Act ("APA") and the National Environmental Protection Act ("NEPA"). First Amended Complaint, Center for Biological Diversity II, No. 08-1339 (Dkt. # 76). In addition, on May 15, 2008, the Conservation Groups filed a notice of intent to sue pursuant to the citizen suit provisions of the ESA, 16 U.S.C. § 1540(g), which detailed the Secretary's violations of the ESA by failing to use the best available science in determining that polar bears were "threatened" rather than "endangered" in all or parts of their range; failing to designate critical habitat for the polar bear concurrently with the Final Listing Rule, 16 U.S.C. § 1533(a)(3)(A)(i); and issuing the 4(d) Rule in contravention of ESA requirements, 16 U.S.C. § 1533(d).

Pursuant to a Joint Case Management Statement filed in Center for Biological Diversity II, Conservation Groups then filed a Second Amended Complaint incorporating these claims. Center for Biological Diversity II, No. 08-1339 (Dkt. # 126). In the Joint Case Management Statement, the parties also agreed that the case before the Northern District of California shall be resolved on cross motions for summary judgment. Center for Biological Diversity II, No. 08-1339 (Dkt. # 102). Under the briefing schedule issued

by the court in <u>Center for Biological Diversity II</u>, Conservation Groups must submit their motion for summary judgment and opening brief on Oct. 30, 2008, Defendants must file any opposition and cross motion by Nov. 26, 2008, and the final hearing on these motions and replies to these motions will occur on Jan. 8, 2009.  Stipulation Re Filing of Second Amended Complaint, <u>Center for Biological Diversity II</u>, No. 08-1339 (Dkt. # 113); See also August 13, 2008 Order at 9 (Dkt. # 139).

Litigation over the Final Listing Rule began in this Court on May 23, 2008 when Safari Club International and Safari Club International Foundation (collectively "Safari Club") filed a complaint challenging the Secretary's listing decision.  <u>Safari Club International v. Kempthorne</u>, No. 08-881, (D.D.C. May 23, 2008).  The Safari Club complaint challenges the ban on the import of trophy-hunted polar bear parts under the Marine Mammal Protection Act, 16 U.S.C. §§ 1361 <u>et seq.</u> ("MMPA"), which was triggered by the polar bear's ESA listing.  <u>Safari Club</u>, No. 08-881 (Dkt. # 1).  Currently, Safari Club's claims are brought solely pursuant to the MMPA and the APA, but it has filed a sixty-day notice letter with Secretary under ESA and its Complaint also stated its intention to bring additional claims pursuant to the ESA.  <u>See</u> <u>id.</u> at ¶ 19.

Given the Conservation Groups' interest in protecting the polar bear, as evidenced by their present and historical advocacy, they filed a Motion to Intervene in Safari Club's action.  <u>Safari Club,</u> No. 08-881, (Dkt. # 11).  On July 10, 2008, the Court granted Conservation Groups' permissive intervention as defendants.  On August 5, 2008, the Court issued an order setting a timeframe for the parties to conference and to present a meet and confer statement.

On August 4, 2008, Alaska filed this action.  Alaska's case currently consists of eight claims for relief.  These claims allege that the listing of the polar bear as threatened violates the procedural and substantive mandates of the ESA, the MMPA and the APA. Complaint, Dkt. # 1.  Given Conservation Groups' extensive involvement in gaining protections for the polar bear, they now seek to intervene as of right in Alaska's suit challenging the Final Listing Rule.

**D.     The Movant Conservation Organizations**

The Center for Biological Diversity is a national nonprofit conservation organization with 160,000 members and supporting online activists.  Declaration of Kieran Suckling in Support of Motion to Intervene ("Suckling Decl.") ¶ 9 (attached hereto as Exhibit A).  The Center's primary mission is the protection of imperiled species, such as the polar bear, and their habitats.  Id. ¶ 2.  Additionally, the Climate, Air and Energy Program ("Climate Program") within the Center, focuses its work and advocacy efforts on curbing global warming and limiting its damaging effects on endangered species and their habitats.  Id. ¶ 3.  Obtaining protection of the polar bear is one of the Climate Program's leading campaigns to protect species most imperiled by global warming.  Id. ¶ 4.

The Natural Resources Defense Council ("NRDC") is a national nonprofit environmental organization with approximately 421,550 members nationwide.  NRDC uses law, science and the support of its members to ensure a safe and healthy environment for all living things.  Declaration of Gina Trujillo in Support of Motion to Intervene ("Trujillo Decl.") ¶ 4 (attached hereto as Exhibit B).  One of NRDC's top

priorities is the protection of threatened and endangered species such as the polar bear.
Id. ¶ 9.

Greenpeace, Inc. is an international nonprofit environmental organization with
about 250,000 members in the United States. (Declaration of Melanie Duchin in Support
of Motion to Intervene ("Duchin Decl.") ¶ 2 (attached hereto as Exhibit C).
Greenpeace's mission is to raise public awareness of environmental problems and
promote changes that are essential to a green and peaceful future. Id. For the past
decade, Greenpeace has worked to raise awareness of the effects of global warming in the
Arctic, including the impacts on polar bears and other species who are threatened by
continued global warming. Id.

As discussed further below, the Conservation Groups and their members have
significant professional and personal interests in the polar bear, its habitat, and its
protection. Suckling Decl., Lopez Decl., Duchin Decl., Declaration of Jack Lentfer in
Support of Motion to Intervene (attached hereto as Exhibit D), Declaration of Jenny Ross
in Support of Motion to Intervene (attached hereto as Exhibit E).

## ARGUMENT

## I.    CONSERVATION GROUPS ARE ENTITLED TO INTERVENE AS OF RIGHT

The D.C. Circuit uses the following four-part test to evaluate motions to intervene
as of right: "(1) the application to intervene must be timely; (2) the applicant must
demonstrate a legally protected interest in the action; (3) the action must threaten to
impair that interest; and (4) no party to the action can be an adequate representative of the
applicant's interests." S.E.C. v. Prudential Sec., Inc., 136 F.3d 153, 156 (D.C. Cir. 1998);
see also Mova Pharm. Corp. v. Shalala, 140 F.3d 1060, 1074 (D.C. Cir. 1998). Rule

24(a) is construed liberally in favor of granting intervention. Nuesse v. Camp, 385 F.2d 694, 702 (D.C. Cir. 1967); see also The Wilderness Soc'y v. Babbitt, 104 F. Supp.2d 10, 18 (D.D.C. 2000) (noting that "the D.C. Circuit has taken a liberal approach to intervention") (citing NRDC v. Costle, 561 F.2d 904, 910-911 (D.C. Cir. 1977)). Following its liberal application of Rule 24, this Court and the D.C. Circuit routinely grant conservation organizations' motions to intervene where they have an interest in pending litigation.[2]

### A.    The Motion to Intervene is Timely

The timeliness of a motion to intervene depends on "consideration of all of the circumstances, especially weighing the factors of time elapsed since the inception of the suit, the purpose for which intervention is sought, the need for intervention as a means of preserving the applicant's rights, and the probability of prejudice to those already parties to the case." United States v. AT&T Co., 642 F.2d 1285, 1295 (D.C. Cir. 1980).

Here, Alaska filed its complaint on August 4, 2008. Less than two weeks has elapsed, Defendants have not yet answered Plaintiff's Complaint, no dispositive motions have been filed, and no discovery has been taken. Because Conservation Groups have filed at the very inception of the case, their motion is clearly timely. Fund for Animals, Inc. v. Norton, 322 F.3d 728, 735 (D.C. Cir. 2003) (finding motion timely where it was

---

2 See, e.g. George E. Warren Corp. v. EPA, 159 F.3d 616 (D.C. Cir. 1998), amended by 164 F.3d 676 (D.C. Cir. 1999) (three environmental groups authorized to intervene on EPA's behalf in industry challenge to EPA air rules); Wilderness Soc'y v. Morton, 463 F.2d 1261 (D.C. Cir. 1972) (Canadian environmental group allowed to intervene in U.S. environmental group's challenge to Interior Department's compliance with environmental procedures); Nat'l Coal Ass'n v. Uram, 39 Env't Rep. Cas. (BNA) 1624 & n.2, 1994 U.S. Dist. LEXIS 16404, * 1 & n.2 (D.D.C. 1994) (environmental group authorized to intervene in industry challenge to environmental rules, and to act as plaintiff in challenging other aspects of those rules); Kerr-McGee Corp. v. Hodel, 630 F. Supp. 621 (D.D.C. 1986), vacated on other grounds 840 F.2d 68 (D.C. Cir. 1988) (environmental group authorized to intervene in industry litigation challenged alleged government inaction on mining leases).

filed "less than two months after plaintiffs filed their complaint and before the defendant's answer was filed").

### B.    Conservation Groups Have a Significant Protected Interest in the Polar Bear

Conservation Groups satisfy the second requirement on Fed. R. Civ. P. 24(a) because they have a significant protected interest in the polar bear, the subject matter of this litigation. Rule 24(a)(2) requires that an intervenor have an interest that is related "to the property or transaction which is the subject of the action." When assessing the interest requirement, the D.C. Circuit has adopted a liberal approach, looking to the "policies behind the 'interest' requirement" in the rule, and viewing the rule as a "practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process." Nuesse v. Camp, 385 F.2d at 700; see also Foster v. Gueory, 655 F.2d 1319, 1324 (D.C. Cir. 1981). This Circuit has observed that "[t]he right of intervention conferred by Rule 24 implements the basic jurisprudential assumption that the interest of justice is best served when all parties with a real stake in a controversy are afforded an opportunity to be heard." Hodgson v. United Mine Workers of America, 473 F.2d 118, 130 (D.C. Cir. 1972).

As is apparent from the procedural history described above, Conservation Groups and their members have a clear and legally cognizable interest in this action. Conservation Groups' initial petition to the Secretary commenced the polar bear listing process. 72 Fed. Reg. at 1065. Conservation Groups were then required to file two lawsuits to compel the Secretary to follow his obligations under the ESA after he missed the ESA's mandatory deadlines. Id., 73 Fed. Reg. 28,212. The second of these suits is currently ongoing in the Northern District of California, and Conservation Groups are

litigating the same Final Listing Rule challenged here, as well as defending aspects of the protections secured by the listing in the related Safari Club case.

Conservation Groups also have a substantial interest because, as briefly described above, their missions encompass the protection of imperiled species and their members have a specific interest in the survival and conservation of the polar bear and marine mammals, in general.  The organizational mission of the Center for Biological Diversity is to "secure a future for animals and plants hovering on the brink of extinction, for the wilderness they need to survive, and by extension, for the spiritual welfare of generations to come."  Suckling Decl. ¶ 2.  One organizational purpose of NRDC is "[t]o preserve, protect, and defend natural resources, wildlife and the environment against encroachment, misuse and destruction."  Trujillo Decl. ¶ 4.  The organizational purpose of Greenpeace is to raise public awareness of environmental problems and promote changes that are essential to a green and peaceful future, and Greenpeace has campaigned for the protection of the Arctic and Arctic wildlife like the polar bear for many years.  Duchin Decl. ¶ 2.

Individual members of the Conservation Groups also have diverse personal and professional interests in the protection of polar bears and their habitat.  See Suckling, Lentfer, Ross and Duchin Decls.  Moreover, in Center for Biological Diversity II, no party questioned Conservation Groups' standing and, in ruling in Conservation Groups' favor, the court implicitly affirmed Conservation Groups' standing.  This circuit has also implicitly affirmed Conservation Groups' standing in its order granting them permissive intervention in Safari Club's action currently pending before this Court.  See Fund for

Animals, 322 F.3d at 735 (holding that finding of constitutional standing "is alone sufficient to establish that" intervenor satisfies Rule 24's interest requirement).

In sum, the Conservation Groups and their members have demonstrated a long-standing interest in the protection of the polar bear, which easily provides a basis for intervention in this case.  See, e.g., Idaho Farm Bureau Fed'n. v. Babbitt, 58 F.3d 1392, 1397 (9th Cir. 1995) ("[a] public interest group is entitled as a matter of right to intervene in an action challenging the legality of a measure it had supported."); Coalition of Arizona/New Mexico Counties for Stable Econ. Growth v. Dep't of the Interior, 100 F.3d 837, 841-44 (10th Cir. 1996) (individual's involvement with a species through his activities as a photographer, amateur biologist, naturalist, and conservation advocate amounted to sufficient interest for purpose of intervention in litigation covering the species' listing under the ESA); Sagebrush Rebellion, Inc. v. Watt, 713 F.2d 525, 526 (9th Cir. 1983) (environmental groups' "environmental, conservation and wildlife interests" were sufficient for intervention as a matter of right).

In addition to satisfying the "protected interest" and "impairment" prongs of Rule 24(a), the foregoing discussion shows that Conservation Groups also have standing to defend the final polar bear listing decision from Plaintiff's challenge.  Specifically, Conservation Groups and their members can demonstrate injury-in-fact, causation, and redressability.  See Fund for Animals, 322 F.3d at 733 (requiring that prospective intervenors demonstrate standing).

As noted, Conservation Groups are environmental organizations whose missions include the protection of imperiled species.  Suckling Decl. ¶¶ 1-2; Duchin Decl. ¶ 2; Trujillo Decl. ¶¶ 4, 9.  Likewise, Conservation Groups' members have significant

professional and personal interests in the polar bear, its habitat, and its protection.  <u>See</u>
Duchin, Lentfer, Ross and Suckling Decls.  Conservation Groups' interests are among
those interests that the Supreme Court has found sufficient to establish standing.  <u>See</u>,
<u>e.g.</u>, <u>Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.</u>, 528 U.S. 167, 181-82 (2000)
(harm to recreation opportunities constitutes injury in fact for purposes of standing);
<u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 562-63 (1992) ("desire to use or observe
an animal species, even for purely esthetic purposes, is undeniably a cognizable interest
for purposes of standing").

Alaska's case threatens to harm Conservation Groups' interests because Plaintiff
seeks to remove protections currently afforded to this gravely imperiled species by the
Final Listing Rule.  If Plaintiff is successful, polar bears will no longer be provided the
protections of the Endangered Species Act even as they continue to face threats to their
survival, including oil, gas and other development activities in critical habitat; loss of sea
ice habitat resulting from unabated greenhouse gas emissions and global warming;
increased shipping and other industrial activities in critical habitat; increased human-bear
interactions and hunting.  This makes it far more likely the polar bear will continue to
decline and become extinct, obviously harming the Conservation Groups' interests in the
survival and recovery of the species.  In addition, if Plaintiff were to obtain a favorable
decision, it would become more difficult for Conservation Groups to achieve their
objective of providing the polar bear even stronger levels of protection, such as being
listed as endangered and requiring consideration of greenhouse gas emissions and global
warming in making polar bear management decisions.  In short, Plaintiff's claims
challenge the very protections Conservation Groups have fought for years to obtain and

relate directly to claims Conservation Groups are currently litigating in the Northern District of California.

Moreover, a ruling in Alaska's favor could set a precedent that would harm Conservation Groups' interests in protecting other imperiled marine mammals. Among Plaintiff's claims is one that calls on the Court to decide whether or not a species listed as threatened or endangered under the ESA is also automatically considered a "depleted" species under the MMPA. Currently there are 27 marine mammal stocks recognized as depleted by FWS. Of these, only 9 are listed as depleted as a result of a separate rulemaking under the MMPA, rather than purely as a consequence of ESA listing. Thus, if Plaintiff prevailed on its claim that a separate rulemaking under the MMPA is necessary, over twenty species of marine mammals, including most listed whales, and all ESA-listed marine mammals under FWS jurisdiction, could lose their MMPA "depleted status" protections. Similarly, a ruling in favor of Plaintiff on this claim would also prevent other threatened marine mammals from being automatically considered depleted under the MMPA when those species are listed under the ESA. Such results would clearly harm Conservation Groups' interests in protecting other marine mammals and are also the same results Conservation Groups seek to avoid with their participation in Safari Club's action pending before this Court.

Finally, the harm Conservation Groups face can be redressed by a decision that does not compromise either the protections currently afforded the polar bear or Conservation Groups' claims that the species requires additional protections. Accordingly, Conservation Groups have standing in this case.

**C.    This Action Threatens to Impair Conservation Groups' Interests**

Rule 24(a)'s "impairment" requirement concerns whether, as a practical matter, the denial of intervention will impede the prospective intervenor's ability to protect its interests in the subject of the action. As the Advisory Committee Notes for the 1966 amendments to Rule 24(a) explain, "[i]f an absentee would be substantially affected in a practical sense by the determination made in an action, he should, as a general rule, be entitled to intervene."  In keeping with this directive, the D.C. Circuit has observed that the rule's emphasis on "practical disadvantage" was "designed to liberalize the right to intervene in federal actions." Nuesse, 385 F.2d at 701-02.

There is no question that the disposition of Plaintiff's claims has the potential to impair Conservation Groups' interests. Plaintiff challenges the Secretary's decision to list the polar bear as a threatened species throughout its range, claiming that the decision violates the ESA, MMPA and APA. Compl. ¶¶ 48-83.  For example, Plaintiff challenges the scientific data on which the Secretary based his final listing decision, alleging that it does not warrant listing the polar bear under the ESA.  Compl. ¶¶ 48-51.  If Plaintiff succeeded in this claim, it would not only strip the polar bear of needed and warranted protections, as explained in the Final Listing Rule, but could also affect Conservation Groups' claim that the science supports an endangered, rather than threatened listing. This is a claim currently being litigated in the Northern District of California.  Second Amended Complaint for Declaratory Judgment and Injunctive Relief, Center for Biological Diversity II, No. 08-1339 (Dkt. # 126).   A ruling in favor of Plaintiff on this claim would also affect Conservation Groups' overall efforts to protect other Arctic species threatened by global warming, loss of sea ice habitat and oil, gas and other industrial development.  Put simply, if Plaintiff is successful in overturning or weakening

the Final Listing Rule, polar bears will be far more vulnerable to further decline and extinction, which clearly harms the Conservations Groups' interest in protecting the species. Suckling Decl. ¶ 12, Lentfer Decl. ¶ 18. Moreover, any decision in Plaintiff's favor could also set a precedent that would further weaken the existing protections the Secretary has put in place for the polar bear and make it harder to establish additional protections Conservation Groups are currently working to secure for the species.

As in the Safari Club case now before this Court, a court ruling in Plaintiff's favor here would also harm the procedural and informational interests of the Conservation Groups and their members, who have an interest in seeing the protections of the ESA and MMPA properly applied. Suckling Decl. ¶ 14, Lentfer Decl. ¶ 17. The Conservation Groups' interests would be harmed should Plaintiff succeed in forcing a separate rulemaking procedure under the MMPA for polar bears to obtain the same level of protection that they currently enjoy, because the results of such a rulemaking are uncertain, and potentially less protective of the polar bear. Suckling Decl. ¶ 14. That is, a finding in Alaska's favor could set a precedent reducing the protection available not just to polar bears, but to all other marine mammals treated as "depleted" under the MMPA by virtue of being listed as endangered or threatened under the ESA. Suckling Decl. ¶ 13; see Nuesse, 385 F.2d at 319 (recognizing that "*stare decisis* principles may in some cases supply the practical disadvantage that warrants intervention as of right").

Courts have repeatedly found environmental organizations' interests of sufficient risk of impairment to sustain intervention for environmental groups in suits such as this. In Idaho Farm Bureau Federation, for example, the Ninth Circuit held that a disposition of the action in favor of plaintiffs resulting in the delisting of the Bruneau Hot Springs

Snail "would impair [intervenor's] ability to protect their interest in the Springs Snail and its habitat." 58 F.3d at 1398.  In Coalition of Arizona/New Mexico Counties for Stable Economic Growth, the Tenth Circuit held that intervenor's interest in the protection of the Mexican spotted-owl would, "as a practical matter," be impaired by a ruling in favor of the plaintiffs to delist the owl "by the stare decisis effect of the district court's decision, not to mention the direct effect of a possible permanent injunction."  100 F.3d at 844; see also Nuesse, 385 F.2d at 319 (recognizing "*stare decisis* principles" as basis for intervention).

> **D.      Conservation Groups' Interests Are Not Adequately Represented by the Existing Parties**

The Supreme Court has explained that the "inadequate representation" requirement of Rule 24(a) "is satisfied if the applicant shows that representation of his interest 'may be' inadequate; and the burden of making that showing should be treated as minimal." Trbovich v. United Mine Workers of America, 404 U.S. 528, 538 n.10 and acc. text (1972) (citation omitted).  Under this lenient approach, representation may be inadequate where the interests of the party seeking intervention and those of the existing party are "different," even if they are not "wholly 'adverse,'" Nuesse, 385 F.2d at 703, or where they are "similar but not identical." American Tel. & Tel. Co., 642 F.2d 1285, 1293 (D.C. Cir. 1980).  Indeed, "the [D.C. Circuit] Court of Appeals has stated that 'the burden is on those opposing intervention to show that representation for the absentee will be adequate.'" Alexander v. FBI, 186 F.R.D. 21, 31 (D.D.C. 1998) (quoting American Tel. & Tel., 642 F.2d at 1293).

This standard is met here because the Defendants do not represent Conservation Groups' interests in this case.  The D.C. Circuit has frequently recognized that

governmental representation of private intervenors may be inadequate, particularly where the private intervenors can be expected to make different arguments from their governmental counter-parts.  Fund for Animals, 322 F.3d at 736; Dimond, 792 F.2d at 193.  In this case, there can be little doubt that the government will not represent Conservation Groups' interests given the past and continuing litigation between Conservation Groups and the Defendants over the polar bear listing.  See, e.g., Idaho Farm Bureau Fed'n, 58 F.3d at 1398 (noting that the FWS was unlikely to adequately represent Conservation Groups who had "compelled FWS to make a final decision by filing a lawsuit").

For these reasons, this Court should not hesitate to grant intervention as of right pursuant Rule 24(a).

## II.     IN THE ALTERNATIVE TO INTERVENTION OF RIGHT, PERMISSIVE INTERVENTION IS WARRANTED

Should this Court find that Conservation Groups are not entitled to intervene as of right under Rule 24(a), Conservation Groups move that this Court grant permission to intervene pursuant to Federal Rule of Civil Procedure 24(b).  Rule 24(b)(2) provides that:

> Upon timely application anyone may be permitted to intervene in an action . . . when an applicant's claim or defense and the main action have a question of law or fact in common. . . . In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.

The D.C. Circuit has stated that permissive intervention may be granted in the court's discretion if the proposed Intervenor presents "(1) an independent ground for subject matter jurisdiction; (2) a timely motion; and (3) a claim or defense that has a question of law or fact in common with the main action."  E.E.O.C. v. Nat'l Children's Ctr., Inc., 146 F.3d 1042, 1046 (D.C. Cir. 1998).  Additionally, permissive intervention

must not "delay or prejudice the adjudication of the rights of the original parties." Fed.

R. Civ. P. 24(b)(2). Like intervention of right, permissive intervention is to be granted

liberally. E.E.O.C., 146 F.3d at 1045 (permissive intervention granted where intervenor

has substantial interest at stake even if no common claim or defense claimed; "flexible

interpretations" of rule appropriate in favor of intervention); Nuesse, 385 F.2d at 704-06

(D.C. Circuit eschews strict reading of rules to advance policy favoring liberal allowance

of permissive intervention).

      Conservation Groups easily meet all of these requirements. As discussed above

in the context of intervention as of right, Conservation Groups' motion is timely and

existing parties will not be prejudiced. The Court has jurisdiction over Conservation

Groups and their defenses, as they all involve issues of federal law in defending against

the Plaintiff's claims under federal law. Lastly, Conservation Groups' defenses are in

common with Plaintiff's claims both in law and fact, as they address the exact matter

raised by Plaintiffs – the legality of the Final Listing Rule and the implications of listing

of the polar bear under the ESA.

## CONCLUSION

      Conservation Groups respectfully request that, as this Court did in Safari Club,

No 08-881, this Court grant their motion to intervene.

Respectfully submitted,

_____/s/ Benjamin Longstreth_____
Benjamin Longstreth (DC Bar # 974015)
Andrew Wetzler
Natural Resources Defense Council
1200 New York Ave., N.W. Suite 400
Washington, D.C. 20005
Telephone: 202-289-6868

Facsimile: 202-289-1060
blongstreth@nrdc.org
awetzler@nrdc.org

Michael Senatore (DC Bar # 453116)
Center for Biological Diversity
1601 Connecticut Avenue, N.W., Suite 701
Washington, D.C.  20009
Telephone:  202-232-1216
Facsimile:  202-232-1217
msenatore@biologicaldiversity.org

Brendan Cummings
Kassia Siegel
Center for Biological Diversity
P.O. Box 549
Joshua Tree, CA 92252
Telephone:  760-366-2232
Facsimile:  760-366-2669
bcummings@biologicaldiversity.org

ksiegel@biologicaldiversity.org

Dated: August 15, 2008

## CERTIFICATE OF SERVICE

I hereby certify that on this date, August 15, 2008, I caused to be served a true and correct copy of the following documents:

> Intervenor-Conservation Groups' Motion to Intervene as Defendants and Memorandum in Support, declarations in support, proposed order, and Corporate Disclosure Statement.

> [Proposed] Answer of Intervenor Defendants Center for Biological Diversity, Natural Resources Defense Council, and Greenpeace, Inc. to Plaintiffs' Complaint

> Motion for Leave to Appear Pro Hac Vice By Kassia R. Siegel, Declaration of Kassia R. Siegel, Proposed Order.

by first-class mail on the following counsel:

Craig D. Galli
Holland & Hart
60 E. South Temple, Suite 2000
Salt Lake City, UT 84111-1031
Email: cgalli@hollandhart.com

William G. Myers III
Holland & Hart
101 S. Capitol Boulevard, Suite 14.00
Boise. Idaho 83702-2527
Email: wmyers@hollandhart.com

Bradley E. Meyen
Assistant Attorney General
Department of Law
1031 W. 4th Avenue, Suite 200
Anchorage, AK 99501
Email: brad.meyen@alaska.gov

Attorneys for Plaintiff State of Alaska

Kristen Byrnes Floom
U.S. DEPARTMENT OF JUSTICE
601 D Street, NW
3rd Floor
Washington, DC 20004

Attorney for Defendant Department of the Interior

*/s/ Benjamin Longstreth*
Benjamin Longstreth

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**
Civil Action No. 1:08-cv-00881 EGS

# EXHIBIT A

# Declaration of Kieran Suckling in Support of Motion to Intervene

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **SAFARI CLUB INTERNATIONAL, et al.,** | **Civil Action No. 1:08-cv-00881 EGS** |
| **Plaintiffs,** | |
| **vs.** | |
| **DIRK KEMPTHORNE, et al.,** | |
| **Defendants,** | |
| **and** | |
| **CENTER FOR BIOLOGICAL DIVERSITY,**<br>1333 N. Oracle Rd.<br>Tucson, AZ 85705 | |
| **NATURAL RESOURCES DEFENSE COUNCIL,**<br>40 West 20th Street<br>New York, NY 10011 | |
| **GREENPEACE, Inc.,**<br>75 Arkansas St.<br>San Francisco, CA 94107 | |
| **Intervenor-Defendant –Applicants.** | |

## DECLARATION OF KIERAN SUCKLING IN SUPPORT OF
## MOTION TO INTERVENE

I, KIERAN SUCKLING, declare as follows:

1.      I am the Executive Director and founder of the Center for Biological Diversity (the "Center"). This declaration is made in support of the Motion to Intervene in this action filed by the Center for Biological Diversity, Natural Resources Defense Council, and Greenpeace. I have personal knowledge of the facts and statements contained herein and, if called as a witness, could and would competently testify thereto.

2.      The Center is a non-profit corporation with offices in San Francisco, Joshua Tree, Sacramento and Los Angeles, California; Tucson and Phoenix, Arizona;

1

Silver City and Pinos Altos, New Mexico; Portland, Oregon; Chicago, Illinois; Las Vegas, Nevada; Duluth, Minnesota; Richmond, Vermont; and Washington, DC. The Center works to protect wild places and their inhabitants, including the polar bear. The Center believes that the health and vigor of human societies and the integrity and wildness of the natural environment are closely linked. Combining conservation biology with litigation, policy advocacy, and strategic vision, the Center is working to secure a future for animals and plants hovering on the brink of extinction, for the wilderness they need to survive, and by extension, for the spiritual welfare of generations to come. In my role as Executive Director, I oversee all aspects of the Center's conservation work.

3.      Since I helped found the organization in 1989, the Center has grown significantly in staff and members. It has also developed several different practice areas and programs. One such program is the "Climate, Air and Energy Program ("Climate Program"), a program with the primary mission of curbing global warming and sharply limiting its damaging effects on endangered species and their habitats.

4.      One of the Climate Program's core strategies is to protect species most imperiled by global warming and work to encourage management agencies such as the Department of Interior to improve management for these species and take global warming impacts into account when making decisions affecting species. Advocating for the protection of the polar bear has been a focal point of these efforts.

5.      The Center has worked extensively on protecting the polar bear and its Arctic sea-ice habitat, which is quickly disappearing due to greenhouse gases and global warming. In February 2005, the Center petitioned the Secretary of Interior and U.S. Fish and Wildlife Service to list the polar bear as a threatened species under the Endangered Species Act ("ESA"). The petition contained extensive information on the threat to polar bears from global warming, overhunting, oil and gas development, pollution, and other threats. The Natural Resources Defense Council and Greenpeace joined the petition in July 2005, and since then our three organizations have filed several lawsuits to compel

the U.S. Fish and Wildlife Service ("FWS") to comply with the ESA and protect the polar bear to the fullest extent possible under the law. We have submitted comments and additional information in support of listing the polar bear on numerous occasions, including on July 5, 2005, October 12, 2005, December 22, 2005, March 24, 2006, June 15, 2006, April 6, 2007, and October 19, 2008. Our campaign to save the polar bear also includes extensive public outreach and education by writing, posting and disseminating information through our website, opinion editorials, and other outlets on the plight of the polar bear and global warming's dire impact on the Arctic. The Climate Program director and lead author of the polar bear petition has also testified several times before Congressional committees on global warming and its impact on the Arctic ecosystem and the polar bear.

6.     Our efforts to protect the polar bear under the law have proven successful, culminating in the listing of the polar bear as a threatened species on May 15, 2008. This was an important victory for the Center and is a necessary first step in protecting the polar bear and its habitat. The ESA listing provides strong and broad protections that increase the chances that the polar bear and its habitat will survive in the wild.

7.     While the recent listing of the polar bear provides important and necessary protections for the species, we are also working to ensure that the species receives the full protections to which it is entitled under the ESA. These efforts include a legal challenge to FWS' rule promulgated under Section 4(d) of the ESA, 16 U.S.C. § 1533(d), which purports to reduce the protections afforded the polar bear under the ESA. See Center for Biological Diversity v. Kempthorne, Case No. C-08-1339-CW (N.D. Cal.). We have also submitted a 60-day notice of intent to sue as required by the ESA before bringing additional challenges regarding FWS's failure to fully protect the polar bear under the ESA. These claims include challenges to the substance of the 4(d) rule, as well as regarding FWS's failure to designate critical habitat for the polar bear and failure to list

the polar bear as "endangered" rather than the less-protective "threatened" status they currently have.

8.      Having initiated the ESA listing process for the polar bear in 2005, we have dedicated substantial organization resources toward seeking full protection for the species under the ESA.  Any legal challenge to the protections we have helped obtain for the polar bear, threatens to undo or undermine these protections, and consequently threatens our organizational interests in the polar bear, and the interests of our members.

9.      The Center advocates for the protection of polar bears on behalf of itself and its more than 160,000 members and supporting online activists  The Center members and supporting activists throughout North America, including in Alaska and Canada, are vitally concerned with polar bear conservation.  The Center has members who have viewed and plan to view polar bears in the future, and who have educational, moral, spiritual, scientific, ecological and/or recreational interests in the polar bear.  The Center's members, in and outside of, Alaska and the Arctic also enjoy the biological, scientific, recreational, and/or aesthetic values of the areas inhabited by these species.  I have been contacted on numerous occasions by Center members who have encouraged the Center to take all possible actions to protect the polar bear.

10.      The Center has a long history of advocating for the protection of polar bears in the Southern Beaufort Sea population which is shared between Alaska and Canada.  The Center has filed multiple comment letters and lawsuits seeking to protect these bears from the impacts of oil development.  This population is now declining and is showing some of the earliest ill-effects of global warming, including drowning, starving, reduced cub survival, and hungry bears resorting to cannibalism.  This population is also subject to trophy hunting in Canada, with many of the hunters (at least prior to May 15, 2008) being U.S. citizens who would generally seek to import their trophies into the U.S.  Given importation of polar bear carcasses into the U.S. is now prohibited, it is highly unlikely that U.S. trophy hunters will continue to kill bears from this population.

4

11.    The Center's interest in polar bears extends beyond the bears in the Southern Beaufort Sea population. The Center has members who have visited and intend to return to visit polar bear habitat in Alaska and Canada occupied by bears in populations subject to trophy hunting. Many of our members have visited Churchill, Canada to view polar bears from the Western Hudson Bay population. This population is perhaps the most impacted by global warming to date, having declined by over 20% since the late 1980s as the sea-ice season in Hudson Bay has diminished. This population is also overhunted. Many of the hunters who kill bears from this population have been (at least prior to May 15, 2008) U.S. citizens who would generally seek to import their trophies into the U.S. Given importation of polar bear carcasses into the U.S. is now prohibited, it is highly unlikely that U.S. trophy hunters will continue to kill bears from this population.

12.    Plaintiffs' claims in this lawsuit threatens the Center's and our members' interests in protection of polar bears. While Plaintiffs' current claims concern only the imports of sport-hunted polar bear trophies, Plaintiffs have indicated that they will file a notice letter and seek to amend in additional claims regarding the listing decision. However, even if Plaintiffs' case only concerns the question of whether or not trophy hunted polar bear trophies may be imported, any judicial decision on this issue would impact the Center and its members.

13.    As mentioned above, U.S. trophy hunters have regularly killed polar bears from the Southern Beaufort Sea, Western Hudson Bay and other populations. These populations are declining, both as a result of global warming, and (in the case of Western Hudson Bay) as a result of unsustainable harvest. The Center believes that the prohibition of the importation of polar bear carcasses will likely mean that far fewer U.S. trophy hunters will kill polar bears as they will no longer be able to import their trophies. Ultimately, this will likely lead to a reduction in the number of polar bears killed.

14.    A court ruling agreeing with Plaintiffs' position and allowing polar bear carcasses to be imported into the U.S. once again will likely result in a resumption of polar bear hunting by U.S. citizens and renewed harvest pressure on polar bears. Such impacts would harm the interests of the Center and its members. Such a court ruling would also have legal implications beyond the polar bear as it would address the relationship between the ESA and Marine Mammal Protection Act ("MMPA"), and could consequently lessen the protections for all ESA-listed marine mammals, as these species would no longer be subject to the protections provided by "depleted" status under the MMPA.

15.    A court ruling in Plaintiffs' favor would also harm the procedural and informational interests of the Center and its members, as to obtain the same level of protection for polar bears that they currently enjoy, would require a separate rulemaking under the MMPA, the results of which are uncertain and potentially less protective of the polar bear.

16.    Moreover, because Plaintiffs have indicated that they will broaden their challenge of the final listing rule for polar bears, this case threatens to impair additional interests of the Center and its members in the current protections afforded the species under the ESA and MMPA. The Center and its members will be irreparably harmed if the listing decision for the polar bear is overturned or modified to reduce protections that the polar bear desperately needs from greenhouse gas emissions and global warming, oil development and oil spills, overhunting, and other threats. If the polar bear is stripped of its threatened status, or if the protections of the listing are reduced, there would be far less to prevent the decline and extinction of this species. Thus Plaintiffs' lawsuit threatens the Center's interests both in protecting the polar bear and in carrying out our broader organizational goals of preserving biological diversity.

17.    The Center does not believe that Defendants adequately represent the Center's interests in protecting the polar bear. The current ESA protection for the polar

bear only came about after a petition and subsequent litigation by the Center against Defendants to force them to impose statutorily-mandated protections for the species. As described above, the Center is also currently in litigation against Defendants over the inadequacy of current protective measures for the species under the ESA.

18. If the Center is not allowed to intervene in this action, its ability to carry out its mission and protect its members' interests, as described above, will be severely impeded.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on June 12, 2008, at Tucson, Arizona.

_____
KIERAN SUCKLING

*KnowledgePlex, Inc. v. Placebase, Inc. a/k/a Metonymy, Inc.*, D.D.C. 1:07-CV-02315-RMU

# EXHIBIT A

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code*, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Marybeth Peters*

Register of Copyrights, United States of America

**Registration Number:**

## TXu 1-570-162

**Effective date of registration:**

December 14, 2007

## Title

**Title of Work:** DataPlace

## Completion/Publication

**Year of Completion:** 2007

## Author

**Author:** Fannie Mae Foundation

**Author Created:** Computer program

**Work made for hire:** Yes

**Anonymous:** No          **Pseudonymous:** No

## Copyright claimant

**Copyright Claimant:** KnowledgePlex, Inc

560 S. Winchester Blvd., Suite 500, San Jose, CA, 95128

**Transfer Statement:** assignment of all rights

## Limitation of copyright claim

**Previously registered:** No

## Certification

**Name:** KnowledgePlex, Inc., by Troy Anderson

**Date:** December 13, 2007

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**
**Civil Action No. 1:08-cv-01352 EGS**

# EXHIBIT B

# Declaration of Gina Trujillo in Support of Motion to Intervene

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **STATE OF ALASKA** | Civil Action No. 1:08-cv-01352 EGS |
| Plaintiff, | |
| vs. | |
| **DIRK KEMPTHORNE, et al.,** | |
| Defendants, | |
| and | |
| **CENTER FOR BIOLOGICAL DIVERSITY,**<br>1333 N. Oracle Rd.<br>Tucson, AZ 85705 | |
| **NATURAL RESOURCES DEFENSE COUNCIL,**<br>40 West 20th Street<br>New York, NY 10011 | |
| **GREENPEACE, Inc.,**<br>75 Arkansas St.<br>San Francisco, CA 94107 | |
| Intervenor-Defendant –Applicants. | |

## DECLARATION OF GINA TRUJILLO

I, GINA TRUJILLO, declare as follows:

1.      I have personal knowledge of the facts stated herein and, if called upon to testify, could and would give competent testimony thereto.

2.      I am the Director of Member Services and Member Development for the Natural Resources Defense Council ("NRDC"). I have been the Director of Member Services and Member Development for over two years. My duties in this position include supervising the preparation of materials that NRDC distributes to members and prospective members. Those materials describe NRDC and identify its mission. My

1

duties also require that I be very familiar with the database in which information on NRDC Members is regularly maintained.

3.      NRDC is a New York not-for-profit membership corporation, recognized under section 501(c)(3) of the United States Internal Revenue Code.  NRDC has offices in New York, Washington, D.C., San Francisco, Santa Monica, Chicago, and Beijing.

4.      NRDC's certificate of incorporation states that one of NRDC's purposes is "[t]o preserve, protect and defend natural resources, wildlife and the environment against encroachment, misuse and destruction" and "[t]o take whatever legal steps may be appropriate and proper to carry out the foregoing purposes."

5.      NRDC's membership database is maintained in computer format at Public Interest Data, Inc., 1800 Diagonal Road, Suite 400, Alexandria, Virginia, 22314.  I and the staff of NRDC's Membership and Public Education work at the NRDC's headquarters located at 40 West 20th Street, New York, NY 10011.  The membership database is accessible by computer from the NRDC office.

6.      NRDC's by-laws state that: "[u]nless otherwise directed by the Board of Trustees, a person shall become a member . . . by submitting a membership application offered by the Corporation or by making a contribution to the Corporation accompanied by a statement requesting membership in the Corporation."

7.      Membership in NRDC is renewed on an annual basis through payment of renewal membership dues.

8.      A typical NRDC membership sign-up form states, "YES, I WANT TO JOIN NRDC.  Please take legal action and wage campaigns on my behalf to defend our planet's endangered wildlife, wilderness, and environment."  The membership sign-up form states further that NRDC's work depends in part on our members' "participation in our citizen lawsuits."

9.      The protection of threatened species is an important part of NRDC's institutional mission.  In keeping with this mission, NRDC regularly campaigns for the

protection of polar bears. NRDC maintains a "Polar Bear SOS" website (www.polarbearsos.org) that features news updates, action alerts, and educational materials concerning the protection of polar bears. NRDC members are also updated on issues impacting polar bears through information available on the NRDC website, annual reports, the quarterly <u>On Earth</u> magazine, and other mailings. The participation and input that we have received from members demonstrates that polar bear preservation issues are among the most important issues to our members.

10.    NRDC has more than 429,367 members nationwide. There are NRDC members residing in each of the fifty United States and in the District of Columbia and Puerto Rico.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August 11, 2008, at New York, New York.

GINA TRUJILLO

# EXHIBIT B

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code*, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Marybeth Peters*

Register of Copyrights, United States of America

**Registration Number:**

**TXu 1-578-402**

**Effective date of registration:**

May 8, 2008

## Title

**Title of Work:** DataPlace

## Completion/ Publication

**Year of Completion:** 2007

## Author

■ **Author:** Fannie Mae Foundation

**Author Created:** computer program

**Work made for hire:** Yes

**Citizen of:** United States          **Domiciled in:** United States

## Copyright claimant

**Copyright Claimant:** KnowledgePlex, Inc.

560 S. Winchester Blvd., Suite 500, San Jose, CA, 95128

**Transfer Statement:** Assignment of all rights

## Limitation of copyright claim

**Material excluded from this claim:** Excluding first 25 pages of source code

**Previous registration and year:** TXu 1-570-162   2007

**New material included in claim:** All other computer program code

## Rights and Permissions

**Organization Name:** KnowledgePlex, Inc.

**Name:** To whom it may concern

**Address:** 560 S. Winchester Blvd.

Suite 500

San Jose, CA 95128

## Certification

**Name:**   KnowledgePlex, Inc. by Troy Anderson

**Date:**   May 8, 2008

**Correspondence:**   Yes

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**
**Civil Action No. 1:08-cv-01352 EGS**

# EXHIBIT C

# Declaration of Melanie Duchin in Support of Motion to Intervene

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

STATE OF ALASKA, et al.,

    Plaintiff,

    vs.

DIRK KEMPTHORNE, et al.,

    Defendants,

    and

CENTER FOR BIOLOGICAL DIVERSITY,
1333 N. Oracle Rd.
Tucson, AZ 85705

NATURAL RESOURCES DEFENSE COUNCIL,
40 West 20th Street
New York, NY 10011

GREENPEACE, Inc.,
75 Arkansas St.
San Francisco, CA 94107

    Intervenor-Defendant –Applicants.

Civil Action No. 1:08-cv-01352 EGS

## DECLARATION OF MELANIE DUCHIN IN SUPPORT OF
## MOTION TO INTERVENE

I, MELANIE DUCHIN, declare as follows:

1.    I reside in Anchorage, Alaska. I am a member of Greenpeace, Inc. and

have been an employee of Greenpeace, Inc. and its corporate predecessors for over 20

years. I am also a member of the Center for Biological Diversity ("Center"). I rely upon

these organizations to represent my interests in the protection of the environment,

including wildlife such as the polar bear.

1

2.      Greenpeace works to raise public awareness of environmental problems and promote changes that are essential to a green and peaceful future. There are approximately 250,000 current Greenpeace members in the United States. Since the 1980's, Greenpeace has been a lead advocacy organization working to raise awareness of global warming and the protection of wildlife, and to advocate for serious cuts in greenhouse gas emissions through local, national and global action. For the past decade, Greenpeace has campaigned on the causes and impacts of climate change in the Arctic, including the impacts on polar bears and other species who are threatened by continued Arctic warming. My current position with Greenpeace is as a global warming campaigner. In this capacity, I work to document the impacts of global warming on the environment and work for clean energy solutions that will reduce emissions of pollution that cause global warming. Since 1997 my work has had a particular focus on the causes and impacts of global warming in the Arctic, including protection of polar bears and their habitat.

3.      I am also extremely concerned about the protection and preservation of polar bears on a personal level. I choose to live in Alaska in large part because I am close to the Arctic where I am able to observe polar bears and the sea-ice environment on which they depend. As described below I have observed and attempted to observe polar bears in the Arctic many times and plan to continue to do so in the future.

4.      Greenpeace has been working on global warming issues since the late 1980s. Greenpeace has had an office in Anchorage, Alaska since the early 1980s, and staff members in that office have historically campaigned on oil development and climate issues, including the impact of oil drilling and global warming on ice-dependent species

2

such as polar bears. In the early 1990s, Greenpeace campaigned to halt oil exploration and drilling in the Chukchi and Beaufort Seas, in part because of its impact on polar bears.

5.    In the late 1990s, Greenpeace campaigned to end new oil exploration in the Arctic Ocean off the north coast of Alaska, in part to protect polar bears and other ice dependent species not only from the direct impacts of oil exploration, extraction and transportation, but also from the impacts of global warming that would be exacerbated when that oil is burned. Greenpeace sent its icebreaker, Arctic Sunrise, to the Alaskan Arctic every summer from 1997 through 2000 to oppose offshore oil drilling in the Arctic Ocean as well as to document the impacts of global warming on polar bears, Pacific walrus and other ice dependent species.

6.    In 2005 and 2006, two Greenpeace volunteers attempted the first ever summer expedition to the North Pole to highlight the impact of global warming on polar bears. Greenpeace has a long and continuous history working on energy and climate issues in the United States and abroad, with a particular focus on the Arctic and the wildlife that live there, including polar bears.

7.    Also in 2005, the Arctic Sunrise undertook an expedition to Greenland to highlight the impact of global warming on the Greenland ice sheet, glaciers, and ice dependent species such as polar bears.

8.    I have traveled extensively in the Arctic both professionally and recreationally to observe polar bears and their habitat. I have every intention to continue traveling to the Arctic most summers as I have in the recent past and observing and attempting to observe polar bears and their sea ice habitat. In total, I have been to the

3

Arctic at least a dozen times, ranging from ship-based trips lasting longer than a month, to shorter trips to coastal areas, to camping out on a barrier island and on sea ice in the Beaufort Sea. I have been to the Beaufort Sea at least half a dozen times, including this year, and plan to return again in the near future, both on my own and in my work capacity.

9.    I saw my first polar bear in August, 1997, when I was on the Greenpeace ship Arctic Sunrise in the Beaufort Sea a few miles offshore from Prudhoe Bay. A polar bear swam up to the stern of the ship and then climbed up onto a nearby ice floe to get a better look or smell. This polar bear was so thin its ribs were showing and it was shivering. This is likely because it was so far from the pack ice and prime hunting opportunities, because the edge of the pack ice was at least 100 miles distant from where we spotted this bear. The sight of this bear in such poor condition brought me to tears.

10.    Later on the same expedition, in August and early September, I saw at least three additional polar bears in the pack ice in the Beaufort Sea, including one sow with a cub. One of the bears I observed was at a recent successful hunting site. These bears were all very healthy looking compared to the first bear. I observed polar bears again in 1998, also on an expedition on board the Arctic Sunrise.

11.    When we were in the Beaufort Sea in August that year, I saw a sow and a cub walking on the offshore island that the community of Nuiqsut uses for their whaling camp. Later on in the expedition the Arctic Sunrise traveled to the Chukchi, Beaufort and East Siberian Seas. We had scientists on board to observe and count Pacific walrus, polar bears and black guillemot, so we were looking for areas of the ice edge and pack ice where those species would be living. I observed polar bears in the Chukchi, Beaufort and

4

East Siberian Seas, at Wrangell and Herald islands. The bears I observed on this expedition were healthy looking. I also observed polar bears in August, 1999 and in August, 2000, again on expeditions to the Chukchi and Beaufort seas on the Arctic Sunrise.

12.    In March, 2005, I accompanied Arctic explorers on a training trip to Churchill, Manitoba, Canada. While I did not observe any polar bears in the wild on this occasion, I did attempt to observe the bears and did see their tracks on the pack ice.

13.    In May, 2005, I saw polar bears on the pack ice from the air while flying by helicopter from Sredny to Cape Arctichesky in the Severnaya Zemlya archipelago. At this time I was accompanying two Arctic explorers to the starting point (the northernmost point of Cape Arctichesky) for their attempt of the first summer expedition to the North Pole.

14.    In July, 2005, I saw two solitary polar bears and one sow with two cubs on the pack ice in the Greenland Sea while on board the vessel Arctic Sunrise between Scoresbysund and Daneborg on the northeast coast of Greenland. In addition, I spent July 11-13 at the Zackenberg Environmental Research Station on the northeast coast of Greenland. When sea ice disappears in summer, some polar bears are stranded on land and roam the Zackenberg Valley and research station in search of food. Although I did not observe any polar bears in the wild during my time at Zackenberg, I did attempt to observe them while at the station and out on the tundra.

15.    In May, 2008, I traveled to Barrow, Alaska and assisted with ringed seal research on the Beaufort and Chukchi Seas. This work involved helping collect seal skin at breathing holes for genetic testing, handling the seal dog, and helping to set nets for

trapping seals that would then be measured and tagged by biologists. I observed ringed seals basking and polar bear tracks on the sea ice. I also looked for polar bears and other marine mammals that use the sea ice and inhabit the Arctic marine and coastal environments.

16.    I intend to travel back to the Arctic to view polar bears and other wildlife. Specifically, I intend to return to the Beaufort and/or Chukchi seas in May of 2009 and in subsequent years to help with ringed seal research on the pack ice. I am also writing a proposal to send one of my organization's icebreakers on an ice-edge expedition to the Beaufort, Chukchi and East Siberian Seas in late summer/early fall of 2009. If approved, I will be on board the icebreaker during the expedition. If the ice-edge expedition does not take place in 2009, a similar expedition is virtually certain in 2010 or 2011, and I will be on board. Beyond my professional interest in the Arctic, I also hope to spend some personal recreation time in the Arctic during the summer of 2009 or 2010. Specifically, I intend to organize a rafting trip that concludes at the Arctic Ocean. I enjoy traveling in the Arctic in my personal time to observe wildlife in their natural environment, which includes polar bears and other marine mammals which are dependent on the sea ice.

17.    I am extremely concerned about the health of the environment and the maintenance of biological diversity. I choose to live in Alaska in large part because it puts me closer to the Arctic and polar bear habitat. Being able to visit and appreciate the beauty of the Arctic and the unique species such as polar bears that live there is very important to me. Witnessing the disappearance of the Arctic sea-ice habitat due to global warming and the degradation of polar bear habitat due to oil and gas development has a highly negative psychological impact on me and causes me great sadness.

6

18.    I am extremely concerned about the survival of polar bears and their sea-ice habitat in the Arctic. I derive great professional, scientific, recreational, aesthetic and spiritual benefit from the existence of this unique animal. I also derive great benefit from the existence and persistence of its Arctic environment. The continued existence of polar bears and their habitat greatly enhances the quality of my life personally, professionally and spiritually.

19.    In recent years I have become increasingly concerned about the threats to the continued existence of polar bears in the wild. Polar bears are threatened by the melting of their sea-ice habitat, a consequence of global warming brought about by society's burning of fossil fuels for energy and the resulting greenhouse gas emissions. Polar bears are also threatened in a number of ways by the proliferation of oil and gas development in their habitat, both onshore and offshore. The risks include the disturbance of denning polar bears, the risk of oiling of polar bears and their prey from oil spills, as well as increased interactions with humans and other forms of industrial disturbance, and increased shipping in the Arctic due to decreasing summertime Arctic sea ice.  Polar bears are also imperiled by over hunting in parts of Canada, Russia, and Greenland.

20.    I believe that the U.S. Fish & Wildlife Service's ("FWS") final rule issued May 15, 2008 listing the polar bear as a threatened species under the Endangered Species Act helps protect polar bears from these threats and greatly increases the chances that polar bears will persist in the wild in coming years. For example, the Endangered Species Act listing ensures that oil and gas development in polar bear habitat will be subject to more stringent review prior to approval, thereby increasing protection for polar bears from oil spills and disturbance.

7

21.    I believe that if the polar bear listing decision is overturned or modified in a way which decreases protections to polar bears, then the polar bear is more likely, if not certain, to suffer substantial population declines and to become extinct. If polar bear populations decline or become extinct, I will suffer in a number of ways. I believe that the entire Arctic web of life will be degraded at best and destroyed at worst if it loses the polar bear and/or its sea-ice habitat which is the underpinning of the entire ecosystem. I will also suffer a loss of psychological and spiritual well-being, from knowing that polar bears are in decline and/or are extinct. I would suffer a professional, aesthetic, spiritual and recreational loss from my inability to observe and appreciate these animals in the wild. My enjoyment of the Arctic is diminished when animals are missing from the ecosystem.

23.    My interests are threatened by Plaintiff's challenge to the FWS's final rule listing the polar bear as a threatened species. Plaintiff's challenge to the rule could result in the polar bear losing all or part of the broad and significant protections it needs under the Endangered Species Act. If the listing is modified or overturned, however, there will be far less to prevent the decline and extinction of this species. I believe that the final listing decision for the polar bear, at issue in this lawsuit, gives the polar bear a much greater chance of persisting in the wild, and therefore increases the chances that I and others will be able to continue to observe, enjoy, and appreciate this species and its habitat in the Arctic.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

8

Executed on August 12, 2008, at _Anchorage, Alaska_.

_Melanie Duchin_
MELANIE DUCHIN

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**
**Civil Action No. 1:08-cv-01352 EGS**

# EXHIBIT D

# Declaration of Jack Lentfer in Support of Motion to Intervene

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **STATE OF ALASKA**<br><br>     **Plaintiff,**<br><br>      **vs.**<br><br>**DIRK KEMPTHORNE, et al.,**<br><br>     **Defendants,**<br><br>      **and**<br><br>**CENTER FOR BIOLOGICAL DIVERSITY,**<br>**1333 N. Oracle Rd.**<br>**Tucson, AZ 85705**<br><br>**NATURAL RESOURCES DEFENSE**<br>**COUNCIL,**<br>**40 West 20th Street**<br>**New York, NY 10011**<br><br>**GREENPEACE, Inc.,**<br>**75 Arkansas St.**<br>**San Francisco, CA 94107**<br><br>      **Intervenor-Defendant –**<br>**Applicants.** | **Civil Action No. 1:08-cv-01352**<br>**EGS** |

### DECLARATION OF JACK W. LENTFER
### IN SUPPORT OF CONSERVATION GROUPS'
### MOTION TO INTERVENE

I, Jack W. Lentfer, declare as follows:

1.     I reside in Homer, Alaska. I have been a member of the Natural Resources Defense Council since 1982 and of the Center for Biological Diversity since 2005.

2.     I am a former employee of both the Alaska Department of Fish and Game

("ADFG") and the U.S. Fish and Wildlife Service ("FWS"). Shortly after joining ADFG in the early 1960s I became Polar Bear Project Leader and directed polar bear research and management for the State of Alaska. ADFG's research focused on assessing polar bear distribution, abundance, and life history, including movement patterns, breeding age, breeding interval, litter size, age-specific mortality, and reproductive rate. Population discreteness was assessed to determine if a single circumpolar population required an international management regime or if a number of discrete populations required separate management regimes by the various polar bear nations. Research also provided the basis for regulating hunting and defining critical habitat.

3.      The Marine Mammal Protection Act of 1972 ("MMPA") transferred polar bear management authority from ADFG to FWS, which I then joined as FWS's polar bear project leader. At FWS we continued the research program started by ADFG with additional emphasis on effects of industrial activities, mainly oil exploration and development, in polar bear habitat.

4.      In 1965, while at ADFG, I was a United States representative at the first international polar bear meeting, attended by researchers and managers from the five nations with polar bear populations. From this meeting evolved the international Polar Bear Specialist Group ("PBSG"), on which I served until 1979. The group met approximately every two years under the auspices of the International Union for the Conservation of Nature ("IUCN"). We developed a coordinated research program throughout the polar bears' range and, in conjunction with IUCN, began drafting an international polar bear agreement. I was on the United States negotiating team that finalized the International Polar Bear Agreement in 1973.

5.      From 1973 to 1976 I served on the first Scientific Advisory Committee of the U.S. Marine Mammal Commission ("MMC"), which was established by the MMPA, and served again on the advisory committee in the 1980s. Following this, I received a presidential appointment as a Commissioner of the MMC. During my time at the MMC, it dealt with a number of polar bear issues, all of which I was involved with.

7.      Since retiring, I have stayed involved with polar bears by reviewing papers for scientific, peer-reviewed journals, advocating for protection of polar bear habitat, serving on a working group to establish a United States-Russian Agreement on Conservation of Polar Bears, assisting on a FWS research project to develop a polar bear census technique, and camping along Alaska's north coast to find dens and photograph bears emerging after winter hibernation.

8.      Polar bears and the Arctic have been major components of my professional and personal life and I have had years of contact with bears in their natural habitat. In addition to work in Alaska's Arctic I have worked with polar bear biologists in Spitsbergen and Canada, and was a visiting lecturer in 1981-82 at the Institute of Arctic Biology, University of Tromso, Norway. I have also traveled, often with my wife, in Antarctica, South Georgia Island, Spitsbergen, Lapland, Siberia, and the Canadian Arctic, as well as St. Lawrence Island and the northwestern and northeastern Alaska mainland.

9.    I plan to continue traveling to Arctic Alaska. Places my wife and I would like to visit in the near future include Teshekpuk Lake and the adjoining Beaufort Sea coastal area and also Kasegaluk Lagoon formed by barrier islands along the Chukchi Sea coast southwest of Icy Cape. We would hope to be able to observe polar bears in both of these locations. I also plan to visit the Kaktovik area in the fall when polar bears are concentrated on the beach feeding on bowhead whale carcasses.

10.    Because of my long history of polar bear research and working for polar bear conservation, I am extremely concerned about the threat that global warming poses to polar bears. The disappearance of sea ice, on which polar bears depend, poses a threat not only to polar bears, but also to the entire Arctic ecosystem, a unique environment that is of great significance to me and that I have dedicated my career to studying and preserving.

11.    I am also concerned that the threat posed by global warming may be exacerbated by other stressors on polar bear populations, such as continued hunting in Canada and oil and gas development.

12.    I support the FWS's decision to list the polar bear under the Endangered Species Act, which it published on May 15, 2008, though I believe that, at a minimum, in some locations the polar bear should have been listed as an "endangered," rather than as a "threatened" species. After more than a year of inaction on its proposed listing rule, I was relieved that the FWS finally listed the polar bear under the Endangered Species Act. This rule will provide more protection for the polar bear and its disappearing sea ice habitat.

13.    Polar bears are in real need of this protection. The latest science shows that the Arctic sea ice is melting faster than previously projected, and that the ongoing warming and melting of the Arctic is having a profound negative impact on polar bears. The disappearance of sea ice, on which polar bears depend, poses a threat not only to polar bears, but also to the entire Arctic ecosystem, a unique environment that is of great significance to me and that I have dedicated my career to studying and preserving.

14.    At its last meeting, the PBSG expressed grave concern about global warming and the possibility that it would lead to the extinction of polar bears. I am also aware that scientists at the U.S. Minerals Management Service have reported an increase in polar bear drownings off the northeast coast of Alaska. This has occurred because global warming has created much more open water that bears now have to swim through to move back and forth between the ice and the mainland. The researchers suggest that drowning-related deaths may increase in the future if warming trends continue.

15.    The U.S. Geological Survey ("USGS") has published a series of reports providing information relevant to the listing of the polar bear. I find these reports comprehensive, science-driven, and compelling in their support of listing.

16.     I have also reviewed findings of the U.S. Marine Mammal Commission ("MMC") which is charged with making recommendations to the Secretary of the Interior regarding the Endangered Species Act. The MMC states that USGS modeling to predict reductions in sea ice constitutes the best scientific information available and that a strong justification exists for listing under the Endangered Species Act at the present time. This further reinforces my belief that it was appropriate to list the polar bear under the ESA.

17.     On February 6, 2008, the U.S. Minerals Management Service conducted an oil and gas lease sale in polar bear habitat off Alaska's northwest coast in the Chukchi Sea. This occurred before a decision on listing was made, even though a decision on listing was due by January 9, 2008. I believe that the listing of the polar bear is essential in order to ensure that such massive oil and gas leases do not contribute to the extinction of the species.

18.     I am familiar with the projections of sea ice loss and polar bear decline produced by the U.S. Geological Survey ("USGS"). The USGS predicts that the last polar bear refugia will be located in the central part of the Canadian archipelago region, including in areas that are now subject to trophy hunting. It is vital that the polar bear populations in these potential refugia areas be kept as healthy as possible, and we certainly do not want to be cutting into them with continued trophy hunting.

19.     I am also aware that most polar bear trophy hunters in Canada come from the United States. I am further aware that FWS has taken the position that, because polar bears are now listed as a threatened species, no further importation of polar bear trophies into the United States is permissible under U.S. law. Based on my experience as a polar bear biologist and wildlife professional, I believe that if the importation of trophy hunted polar bears into the United States is prohibited, less polar bear hunting will take place in Canada because efforts to solicit replacement hunters from other countries will have limited success.

20.     I know that the State of Alaska has filed a lawsuit in an attempt to vacate the United States Department of the Interior's decision to list the polar bear as threatened under the Endangered Species Act. In addition, the State of Alaska seeks to prevent the Department of the Interior from relying on or enforcing protections under the MPPA for the polar bear based on its status as a depleted species. As explained above, I believe that, if successful, this lawsuit will diminish the ability of polar bears to survive and, eventually recover throughout the Arctic by eliminating the protections the polar bear now receives under the Endangered Species Act.

21.     As a former MMC Commissioner, I am also aware of the procedural requirements that the Marine Mammal Protection Act imposes on the federal government to protect species listed and endangered or threatened under the Endangered Species Act. I believe that these requirements are a vital part of the Marine Mammal Protection Act and as a wildlife professional, someone who cares about polar bears, and a citizen, I have in interest in seeing those procedures correctly applied to the polar bear.

22.    The listing of the polar bear under the Endangered Species Act provides much needed protection to this species. If the protections of the Endangered Species Act are weakened or eliminated through this lawsuit, the polar bear will lose these important protections. If this happens, I believe the polar bear is more likely to become extinct. The extinction or substantial decline of polar bears would deprive me of my ability to observe and appreciate polar bears in their natural habitat and would harm my professional, scientific, recreational, and aesthetic interests. I am therefore directly harmed by Plaintiff's suit.

23.    I depend upon NRDC and the Center for Biological Diversity to represent my interests in the protection and preservation of imperiled species and their habitats, including polar bears, and to represent my interests in this lawsuit.

///
///

I declare under penalty of perjury that the foregoing is true and correct and was executed on August _14_ th at Homer, Alaska.

Jack W. Lentfer
Jack W. Lentfer

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**
**Civil Action No. 1:08-cv-01352 EGS**

# EXHIBIT E

# Declaration of Jenny Ross in Support of Motion to Intervene

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **STATE OF ALASKA** | Civil Action No. 1:08-cv-01352 EGS |
| **Plaintiff,** | |
| **vs.** | |
| **DIRK KEMPTHORNE, et al.,** | |
| **Defendants,** | |
| **and** | |
| **CENTER FOR BIOLOGICAL DIVERSITY,**<br>**1333 N. Oracle Rd.**<br>**Tucson, AZ  85705** | |
| **NATURAL RESOURCES DEFENSE COUNCIL,**<br>**40 West 20th Street**<br>**New York, NY 10011** | |
| **GREENPEACE, Inc.,**<br>**75 Arkansas St.**<br>**San Francisco, CA 94107** | |
| **Intervenor-Defendant –Applicants.** | |

**DECLARATION OF JENNY E. ROSS IN SUPPORT OF MOTION TO INTERVENE**

I, Jenny E. Ross, state and declare as follows:

     1.     I have personal knowledge of the following facts, and if called as a witness could and would testify competently thereto.

     2.     My address is PO Box 10037, Truckee, California.  I received a Bachelors degree from Stanford University in philosophy, with emphasis and an honors thesis on philosophy of science and biomedical ethics and a minor in biology in 1983, and a J.D. from Harvard Law School in 1986.

3.      I care deeply about the natural world and biodiversity.  I am a member of the Center for Biological Diversity ("Center"), and I rely upon the Center to represent my interests in protection of the environment through advocacy and the enforcement of our environmental laws. I am also a member of the Natural Resources Defense Council ("NRDC").

4.      I practiced law for a number of years, but am now a freelance photographer and writer specializing in wildlife natural history and conservation subjects, and environmental issues. I take photographs that capture the essence of wild animals and wild places, explain scientific research to non-scientists, inspire concern and action for wildlife conservation and ecosystem protection, and elicit a renewed appreciation of the natural world. My images of wildlife and ecosystems and my essays on natural history and conservation have been displayed in a number of professional exhibitions. I have also collaborated with renowned scientists to create presentations and articles that combine photographs with scientifically accurate and engaging information.

5.      For the past several years much of my work has focused on bears. In 2002 I was commissioned to create a traveling photographic exhibition about the world's eight living bear species. The goal of the project was to enlighten a broad cross-section of the general public about the biology, ecology, behavior, management, and conservation of bears using compelling fine art photographs to illustrate and dramatize the exhibition's educational content.

6.      For approximately two years, I spent much of my time studying bears, hiking in their habitat, observing their daily lives, and photographing them. I also accompanied bear biologists in the field, and photographed their research activities. From this work I created a traveling exhibition entitled *Bears! Icons of the Wild.* The exhibit has been displayed at a variety of public venues, including the Anchorage Museum of History & Art, the California Exposition, the Carnegie Museum of Natural History, Lindsay Wildlife Museum, and the Pacific Grove Museum of Natural History. More than half a million people have viewed the exhibition since its premier in April

2004. Polar bears are of course one of the eight bear species that I studied, photographed, and wrote about for the exhibit project, and they are prominently featured in *Bears! Icons of the Wild.*

7.      Following creation of the exhibit I have continued to visit polar bear habitat, to observe and photograph the bears, and to collaborate with scientists who are studying them. I have also reviewed much of the current scientific literature relating to polar bears and their habitat. Based on my work, I have created a slideshow and lecture entitled *Life on Thin Ice: Polar Bear Biology, Ecology, Behavior, and Conservation.* This presentation includes more than 150 of my polar bear photographs and covers numerous scientific issues in a manner that is interesting and engaging for a general audience. Recent clients and venues for the presentation include: The Alaska Bear Forum, the Anchorage Museum of History & Art, California Audubon, the Desert Research Institute, Lindsay Wildlife Museum, the Northern Nevada Science Coalition, Oceanwide Expeditions, Polar Bears International, the Pratt Museum, the Pacific Grove Museum of Natural History, San Francisco Zoo, Sierra Club, Squaw Valley Institute, and the Tahoe Bear League.

8.      My work and my life have been directly impacted by the effects of climate change on the natural habitats of the polar bear and other bear species. Extensive information collected and analyzed by scientists around the world demonstrates unequivocally that climate change is altering the Arctic habitat of polar bears and posing a fundamental threat to their continued survival.  In recognition of the growing threat to polar bears from global warming, the IUCN / World Conservation Union's Polar Bear Specialist Group – the world's leading scientific body with specific expertise regarding polar bears – recommended in 2005 that polar bears be classified as "Vulnerable" on the IUCN Red List. The IUCN "Vulnerable" classification signifies that a species is facing a "high risk of extinction in the wild."

9.      During the course of my work it has become clear to me that climate change is affecting the icy Arctic environment polar bears depend upon for all aspects of

their lives; and, as a consequence, climate change is already having a significant impact on the bears themselves. For example, in the Western Hudson Bay area, scientists have determined that the polar bear population declined by 22 percent between 1987 and 2004 as a result of deteriorating ice conditions due to climate change. Because they cannot hunt seals in the absence of sea ice, the bears have been obliged to endure increasingly long periods of food-deprivation as the ice-free season on Hudson Bay has lengthened. Consequently, polar bears in that region now weigh about 15 percent less than they did 30 years ago; and that decline in physical condition is having a discernible adverse impact on the population's natality and survivorship.  These changes affect the subjects of my photographs and therefore my livelihood and personal well-being.

10.    I have suffered, and continue to suffer, personal harm due to the impacts on polar bears from climate change. I have seen polar bears in the Western Hudson Bay region struggling to survive during the lengthy ice-free period that now extends from July through late November. On numerous occasions I have witnessed the heart-wrenching spectacle of very skinny bears pacing along the shore of Hudson Bay in late fall and staring constantly at the open water, clearly desperate for sea ice to form so that they can resume hunting seals. On one occasion I observed an emaciated mother polar bear accompanied by her young twin cubs near the edge of unfrozen Hudson Bay in mid-November. Her anxious demeanor, coupled with my knowledge that she would likely starve to death before the sea ice formed or be too weak to hunt once it did, and that her small offspring would then perish as well, caused me profound sadness.

11.    Ice conditions in other portions of the polar bear's range throughout the circumpolar Arctic are also deteriorating and posing great challenges for the bears. A recent report by the U.S. Minerals Management Service indicates that reduced sea ice in the Southern Beaufort Sea is already causing polar bears to drown, because a vast expanse of open ocean now often separates the Alaska coastline from the floating Arctic pack ice. Moreover, a large percentage of the pregnant polar bears in the Southern Beaufort Sea population build their maternity dens out on the sea ice and rear their very

4

young cubs there. Significant declines in the extent and quality of that sea ice could jeopardize the reproductive success of a very large number of bears. These changes affect the subjects of my photographs and therefore my livelihood and personal wellbeing.

12.    I travel frequently to the Arctic to photograph polar bears and other species. In November, 2006 I spent ten days photographing polar bears along the shore of Hudson Bay near Churchill, Manitoba, Canada, as trip leader for a photography expedition. My group was scheduled to spend a portion of the trip at Cape Churchill, a more remote Hudson Bay location within Wapusk National Park, but it proved impossible to travel to that area because the tundra was not sufficiently frozen.

13.    In July 2006 I traveled by ice-breaker in the Svalbard Archipelago, attempting to photograph polar bears. Although there is typically extensive sea ice at that time of year in that portion of the Norwegian Arctic, there was almost none during my trip. Even in locations that were only about 600 miles from the North Pole, the pack ice was absent. As a result, ice-dependent polar bears were very difficult to find. The bears that we were able to locate were limited to the last remaining bits of annual fiord ice or were marooned on land. I observed and photographed several bears, including a small cub, that were obliged to swim from one island to another in search of food due to the lack of ice. Knowing that scientists have documented the recent drowning deaths of polar bears in similar circumstances, I anxiously watched the Svalbard bears as they traveled through the ocean waves. It was poignant and upsetting to see the exhausted young cub, lacking body fat and not well insulated from the cold water, struggling to follow its mother.

14.    Additional warming caused by emissions of greenhouse gasses will substantially affect my ability to continue to visit and photograph polar bears in their natural habitat. Indeed, global warming may cause the extinction of the polar bear and the complete transformation of the Arctic environment in which I work.    Global

warming and the decline of the polar bear have a direct, negative impact on my livelihood.

15.     Another recent example of the detrimental effect of global warming on my livelihood occurred when, at the beginning of March 2006, I traveled to the Gulf of St. Lawrence to photograph adult seals and their pups on the sea ice. During that trip, I witnessed and photographed the changes in ice conditions that are taking place due to climate change. The region experienced unusually warm temperatures that winter. Although historically the Gulf of St. Lawrence has typically been nearly covered with massive floes of thick sea ice in early spring, that year the sea ice was very sparse, thin, and highly fractured as a result of warm temperatures. Due to a lack of sea ice and poor ice conditions, we had considerable difficulty locating any ice at all on which to land a helicopter and photograph seals.

16.     Just a few weeks prior to my arrival in the Gulf of St. Lawrence region in March 2006, a colony of grey seals – which normally give birth to pups on the floating sea ice – had been forced to pup on the beach at Pictou Island due to the absence of ice. Subsequently, a storm surge in the Northumberland Strait engulfed the beach and drowned approximately 75% of the seal pups. Canadian Fisheries officials estimated that more than 2,000 seal pups died.  This recent incident is representative of the profound impacts on the Arctic ecosystem that are occurring due to climate change.

17.     On another trip to the Magdalen Islands (Les Îles de Madeleine) to photograph ice seals in March 2007, I again had a very difficult time even finding any seals, or ice, to photograph, and some days we could not even fly because it was raining. The ice we did encounter was extremely thin and slushy, and melting rapidly. I saw just 2 harp seal pups and one family of hooded seals during a week in the region. I was told by my local guide that many newborn seal pups, which are unable to swim, were drowned when the ice supporting them had disintegrated. The one hooded seal family I photographed was on a small, isolated floe of ice that was moving extremely quickly in the current because there was no other ice surrounding it to hold it in place. I could not

6

remain on the floe photographing the seals for very long, because the floe was rapidly being carried eastward by the current, out of the Gulf toward the Atlantic Ocean and beyond helicopter range.

18.    I have every intention of continuing my career as a nature photographer, and of continuing all of the above-described activities, in the future. Polar bears will remain a major focus of my photography, and as such I have every intention of continuing to visit their habitat as frequently as possible in the coming years. In fact, I am currently working on a book about the changing Arctic which will prominently feature polar bears. Completion of this book will require additional trips to the Arctic during at least the next two years to photograph polar bears.

19.    In summary, polar bears are extremely important to, and greatly enhance, the personal and professional aspects of my life. I have already experienced first hand the effects of global warming on polar bears and the Arctic ecosystem. These changes, and the declining status of the polar bear, have diminished my ability to photograph, observe, and enjoy polar bears and their Arctic habitat. I am extremely concerned about the impact of global warming on polar bears, as well as other threats such as oil and gas development in the Arctic, increased human activity in the Arctic as the area warms, and overhunting of polar bears in some regions.

20.    If global warming and other threats to the species continue unabated, and polar bears remain unprotected, I believe the species will continue to decline and become extinct, and I will be unable to continue to observe and photograph the species in the wild. Although I believe a certain amount of additional climate warming and consequent impacts on polar bears are inevitable, I also believe it is not too late to save them from extinction. To do so we must protect the species under the Endangered Species Act and greatly reduce greenhouse gas emissions in the very near future.

21.    I believe that the safeguards of the Endangered Species Act will help protect this species from global warming and other threats, and will increase the chances that polar bears will persist in the wild in coming years. I believe that if the Endangered

7

Species Act listing of the polar bear is overturned, the species is more likely to suffer disturbance, despoliation of its habitat, and substantial population declines; and, ultimately, I believe the polar bear is more likely to become extinct. If polar bear populations decline or become extinct, I will suffer in a number of ways. I will be unable to continue to photograph them in the wild, which will greatly harm my livelihood and career as a professional nature photographer. My recreational and aesthetic interests in seeing the species in the wild will also be harmed, as will my interests in the functioning of the Arctic ecosystem in which the polar bear plays such an important part. I will also be deeply distressed personally by the loss of this species.

22.    A court ruling in Plaintiff's favor would personally and substantially injure my interests because it would reduce the protections the polar bear now has available as a listed species and would result in increased harm to the species. I would also be substantially and personally injured if the Plaintiff receives a favorable decision because that would negatively affect the Center's ability to seek additional needed protections for the polar bear, including designation and protection of critical habitat, and mandatory consideration of greenhouse gas emissions and global warming in management decisions. Without the current protections afforded the polar bear as a result of the listing decision, as well as other protections sought by the Center, the chances are slim that the species will persist and flourish in the wild. As a result, my ability to continue to photograph, observe and appreciate wild polar bears and their habitat, as well as my ability to educate others about these animals and their Arctic home, would be severely reduced. This would frustrate my interests in polar bears and harm my personal life and livelihood.

I declare under penalty of perjury that the foregoing is true and correct and was executed on August 11, 2008 at Truckee, California.

Jenny E. Ross

Jenny E. Ross

8

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **STATE OF ALASKA** | **Civil Action No. 1:08-cv-01352 EGS** |
| **Plaintiff,** | |
| **vs.** | |
| **DIRK KEMPTHORNE, et al.,** | |
| **Defendants,** | |
| **and** | |
| **CENTER FOR BIOLOGICAL DIVERSITY,**<br>**1333 N. Oracle Rd.**<br>**Tucson, AZ  85705** | |
| **NATURAL RESOURCES DEFENSE COUNCIL,**<br>**40 West 20th Street**<br>**New York, NY 10011** | |
| **GREENPEACE, Inc.,**<br>**75 Arkansas St.**<br>**San Francisco, CA 94107** | |
| **Intervenor-Defendant –Applicants.** | |

## [PROPOSED] ORDER ON INTERVENOR-CONSERVATION GROUPS'
## MOTION TO INTERVENE AS DEFENDANTS

This Court, having reviewed Applicants' Motion to Intervene as Defendants and

accompanying papers, hereby GRANTS Applicants' Motion for Intervention.

IT IS SO ORDERED.

Dated this _____ day of _____ 2008.


_____

UNITED STATES DISTRICT JUDGE

**LOCAL RULE 7(k) LIST OF PERSONS TO BE SERVED WITH ORDER**

Please serve the following electronically:

Benjamin Longstreth
Natural Resources Defense Council
1200 New York Ave., N.W. Suite 400
Washington, D.C. 20005
blongstreth@nrdc.org

Michael Senatore
Center for Biological Diversity
1601 Connecticut Avenue, N.W., Suite 701
Washington, D.C. 20009

Kristen Byrnes Floom
U.S. DEPARTMENT OF JUSTICE
601 D Street, NW
3rd Floor
Washington, DC 20004

Craig D. Galli
Holland & Hart
60 E. South Temple, Suite 2000
Salt Lake City, UT 84111-1031
Email: cgalli@hollandhart.com

William G. Myers III
Holland & Hart
101 S. Capitol Boulevard, Suite 14.00
Boise. Idaho 83702-2527
Email: wmyers@hollandhart.com